JOAN BERNARD ARMSTRONG, Chief Judge.
 

 _JjThe defendant-appellant, the City of New Orleans Police Department (“NOPD”), appeals a judgment dated August 30, 2007, of the Office of Workers’ Compensation in favor of the claimant-appellee, Kirk Johnson.
 

 The judgment states that the claimant was injured in the course and scope of his
 
 *116
 
 employment with the NOPD on October 21, 1999 and that he remains in need of continuing medical treatment attributable to that injury for problems related to his neck and shoulder. The judge below held that the treatment of the claimant’s physicians, particularly Dr. Deryk Jones and Dr. James Butler, was reasonable and medically necessary.
 

 The judgment goes on to find and order the following:
 

 1. The recommended shoulder surgery is medically necessary and related to the injury of October 21, 1999 and the NOPD failed to authorize and pay timely for this surgery.
 

 2. The NOPD failed to reasonably controvert claimant’s entitlement to authorization and/or payment of medical bills associated with lathe surgery. In this regard, the NOPD was assessed the maximum penalty of $2,000.00 along with attorney’s fees.
 
 [1]
 

 3. The NOPD was ordered to pay for the hospital bills associated with the December 2005 myelogram and Mr. Johnson’s complications therefrom which the judge below found to be necessary and related expenses. The judgment states that the NOPD failed to pay those medical expenses on a timely basis.
 

 4. The judge below found that the NOPD failed to reasonably controvert claimant’s medical care related to the first myelogram and claimant’s complications arising therefrom, and, therefore, ordered the NOPD to pay the claimant the maximum penalty of $2,000.00 along with attorney’s fees.
 

 5. The NOPD was ordered to pay for a second cervical myelogram.
 

 6. The NOPD failed to timely authorize and timely pay for the second cervical myelogram and failed to reasonably controvert the claimant’s enti-. tlement to it. Accordingly, the NOPD was ordered to pay the claimant the maximum penalty of $2,000.00, along with attorney’s fees.
 

 7. The claimant’s neck injury “is related to the October 21, 1999 accident
 

 [[Image here]]
 

 |;i8. Neck surgery, anterior cervical dis-cectomy and a spinal fusion procedure at the C6-7 level are necessary medical care related to the October 21,1999 injury.
 

 9. The amount of attorney’s fees was feed at $15,000.00, “based on the amount of the work involved and presented in this case, the amount of the claim and recovery, and the experience and the skill displayed by counsel for claimant.
 

 10. The claimant was awarded $566.26 in costs along with legal interest as provided by law.
 

 The NOPD stipulated that the claimant sustained a work related injury on October 21, 1999. At the time of the accident the claimant was in good health. In fact, in order to become a policeman he had had to meet cei’tain physical fitness requirements. The NOPD does not contest the amounts or necessity for any of the medical expenses awarded by the trial court. The NOPD’s appeal rests primarily on the argument that the claimant failed to prove that many of his complaints subsequent to the accident arose out of that accident and that he also failed to prove that many of
 
 *117
 
 the medical expenses awarded by the trial court were attributable to the accident of October 21, 1999.
 

 The NOPD does not contend that the claimant is malingering in any way or that he is untruthful in the way in which he describes his symptoms. In other words, the NOPD does not dispute the claimant’s credibility or the existence of claimant’s medical problems, but only argues that the claimant has failed to prove that those problems arose out of the accident. Thus, while the NOPD contests the claimant’s entitlement to the medical expenses claimed, and therefore, his entitlement to everything arising in connection therewith, including penalties, | attorney’s fees and costs, the NOPD has not challenged the calculation of any of the amounts awarded. Therefore, after reviewing the record, we find no error in the amounts awarded, assuming at this time for purposes of argument that those amounts were shown to be connected to the accident.
 

 In fact, the parties do not appear to have any material disagreement about the facts as set forth in the record of this case. The point of contention is whether the evidence and testimony as found in the record supports the conclusion that the claimant bore his burden of proving that his medical claims can be related to the injury of October 21,1999.
 

 The NOPD cites
 
 Francis v. Quality Brands, Inc.,
 
 03-1662 (La.App. 3 Cir. 7/4/04), 870 So.2d 589, in support of its contention that: “Claimant failed in his burden of proving the neck relationship by a preponderance of evidence.” In
 
 Francis
 
 the third circuit stated that:
 

 The claimant seeking workers’ compensation benefits must prove by a preponderance of the evidence that she was injured in an accident in the course and scope of her employment.
 
 Burns v. Beauregard Nursing Ctr.,
 
 94-131 (La.App. 3 Cir. 10/5/94), 643 So.2d 443. In addition, the claimant must also establish a causal link between the accident and the subsequent disabling condition.
 
 Marks v. 84 Lumber Co.,
 
 00-322 (La.App. 3 Cir. 10/11/00), 771 So.2d 751. If the evidence leaves the probabilities of causation equally balanced, the claimant has failed to carry her burden of proof.
 
 Bernard v. O’Leary Bros. Signs, Inc.,
 
 606 So.2d 1331 (La.App. 3 Cir.1992).
 

 Id.,
 
 03-1662, p. 2, 870 So.2d at 591.
 

 While we have no disagreement with
 
 Francis
 
 concerning burdens of proof in a workers’ compensation case
 
 [2]
 
 , we do not see where there is anything in
 
 Francis
 
 I,r,suggesting that the claimant in the instant case has failed his burden of proving causation. In fact,
 
 Francis
 
 is authority for affirming the decision of the trial court in the instant case, as the
 
 Francis
 
 court’s decision was a manifest error standard of review affirmation of the trial court’s decision to deny benefits:
 

 The trial court’s determinations with regard to the credibility of witnesses and the discharge of the claimant’s burden of proof are factual issues and should not be disturbed on appeal in the absence of manifest error.
 
 Bruno v. Harbert Int’l, Inc.,
 
 593 So.2d 357 (La.1992). The workers’ compensation judge’s assessments of the weight of the medical evidence are not to be disturbed unless clearly wrong.
 
 Chambers v. Louisiana Pacific Mfg., Inc.,
 
 97-1188 (La.App. 3 Cir. 4/22/98), 712 So.2d 608. Furthermore, where there is a conflict in testi
 
 *118
 
 mony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed unless manifestly erroneous.
 
 Novak v. Texada, Miller, Masterson & Davis Clinic,
 
 514 So.2d 524 (La.App. 3 Cir.), writ denied, 515 So.2d 807 (La.1987).
 

 In this case, Francis gave conflicting stories as to how he injured his back. He did not report a work-related injury at the alleged time of the accident. His co-worker does not corroborate his injury, and Francis’ own statements put his credibility in question.
 

 Id.
 

 Thus, if we are to adopt the reasoning of
 
 Francis
 
 as we are urged to do, we must apply the manifest error standard of review to the workers’ compensation judge’s findings below, and consequently sustain her credibility calls along with her assessments of the weight of the medical evidence and her reasonable inferences of fact and affirm her decision. We especially note that the claimant in
 
 Francis
 
 was found not to be credible, whereas the claimant in the instant case was.
 

 The other authority cited by the NOPD in addition to
 
 Francis
 
 was
 
 Robbins v. Schumpert Medical Center,
 
 35,932 (La. App. 2 Cir. 4/3//02), 814 So.2d 737. The | GNOPD cited
 
 Robbins
 
 in support of its contention that: “The claims handler was not acting arbitrarily or in bad faith as to that issue [i.e., whether claimant’s neck injury arose out of the 1999 accident] and, accordingly, penalties should not have been awarded ...” We find that
 
 Robbins
 
 supports the claimant for the same reason that
 
 Francis
 
 does. In
 
 Robbins,
 
 just as in
 
 Francis,
 
 the appellate court affirms the decision of the trial court. Thus, while the
 
 Robbins
 
 court refuses to award penalties and attorney fees it did so because it was affirming the decision of the trial court, saying:
 

 Thus, we conclude that the trial court was not manifestly erroneous in finding that Defendant’s reliance on Dr. Mead’s opinion was reasonable.
 

 Id.,
 
 35,932, p. 4, 814 So.2d at 740. Thus, if we apply the manifest error reasoning of the
 
 Robbins
 
 court to the instant case, we must affirm the decision of the Worker’s Compensation judge to award penalties and attorney fees, just as this Court did in
 
 Price v. City of New Orleans,
 
 95-1851 (La.App. 4 Cir. 3/27/96), 672 So.2d 1045, where this Court stated that:
 

 The determination of whether an award of penalties and attorney fees is warranted is a question of fact which shall not be disturbed unless manifestly erroneous or clearly wrong.
 
 Lemoine v. Schwegmann Giant Supermarkets,
 
 607 So.2d 708, 713 (La.App. 4th Cir.1992), writ denied, 609 So.2d 258 (La.1992).
 

 Id.,
 
 672 So.2d at 1051.
 

 In
 
 Price
 
 this Court also made the following pronouncement relevant to the review of the decision of the workers’ compensation judge in the instant case:
 

 In deciding whether a plaintiff has proven the claimed disability, the totality of the evidence must be considered. It is the function of the trial court to determine the weight to be accorded to the medical and lay testimony.
 

 \rjld.,
 
 672 So.2d at 1050.
 

 It is uncontested that the claimant in his capacity as a bicycle patrolman for the NOPD was pursuing two men in a park when he hit his brakes and went over the handlebars and landed on his shoulder. He testified that after the accident he was sent to an NOPD physician, Dr. McSwain, who referred him to the orthopod, Dr. Dickson, who in turn referred him to another orthopod, Dr. Deryk Jones. It is the treatment and opinions of Dr. Jones and Dr. James Butler who treated the claimant
 
 *119
 
 for his shoulder and neck related problems respectively that form the crux of this opinion.
 

 Dr. Jones first examined claimant on May 16, 2000. The trial commenced in June of 2007. The last time the claimant saw Dr. Jones prior to trial was on March 30, 2007.
 

 The claimant testified that Dr. Jones performed orthoscopic surgery on his right shoulder approximately one year after the accident. Dr. Jones performed a second such procedure in March of 2001 and a third in March of 2002. Dr. Jones wanted to perform a fourth such procedure, but the request was denied by the claims adjuster.
 

 Claimant’s medical records show that he first complained about his neck and right arm on September 10, 2002, at which time Dr. Jones recommended an EMG/NCS. It is because these complaints arose for the first time almost three years after the accident of October 21, 1999, that the NOPD contends that they are not attributable to that accident and/or that the claimant failed to prove that they were. The NOPD further contends that even if the trial court did not err in finding that the complaints reported by the claimant for the first time in 2002 were | ^attributable to the October 1999 accident, at the very least it was error to find that the NOPD was unreasonable in believing otherwise and that consequently it was error to assess penalties and attorney’s fees against the NOPD.
 

 The NOPD notes that when it referred the claimant to Dr. Gordon Nutik on December 16, 2001, over two years after the accident, the claimant did not complain of neck and arm problems. But that single examination by Dr. Nutik occurred prior to the time those symptoms had evolved.
 

 On October 16, 2002, Dr. Jones reported that the EMG/NCS was positive for a su-prascapular nerve injury. On November 5, 2002, Dr. Jones recommended a cervical MRI to confirm the EMG/NS results. On November 26, 2002, Dr. Jones reported evidence of radiculopathy and that the cervical MRI was positive for impingement at C6-7. On January 21, 2003, Dr. Jones reported that the claimant had complex cervical and right shoulder problems.
 

 The claimant testified as follows:
 

 Q. Okay. Immediately after the accident, tell the Court what injuries, from your perspective, you suffered.
 

 A. My right shoulder hurt a lot.
 

 Q. And, from your perspective, has your right shoulder ever healed or improved since the accident?
 

 A. No, it hasn’t.
 

 Q. Since the accident, have you suffered other injuries or has your injury progressed to other parts of your body.
 

 A. It’s progressed. I started having tingling in my fingers. And he did a nerve check and it said they found some nerve damage up towards my shoulder going towards my neck, my arm and my fingers. And it just got work ever since.
 

 Q. Which arm are you talking about?
 

 IqA. My right arm.
 

 Q. Can you give us an idea of when the problems in your neck and down your arm started after your accident? How soon after the accident?
 

 A. It started around 2002. The accident was in 1999. The first surgery didn’t take place until 2000.
 

 Q. Are you still suffering today from the problems into your neck and down your arm?
 

 Dr. Jones referred the claimant to Dr. James Butler for his neck complaints. Dr.
 
 *120
 
 Butler first saw the claimant on January 26, 2005, at which time he reported that the claimant had evidence of radiculopathy in the right arm, possibly from the neck as well as a degenerative disc and disc protrusion at C6-7. These findings are consistent with those of Dr. Jones discussed earlier ha this opinion. At the same time Dr. Butler repoi’ted that he could not with reasonable medical certainty relate claimant’s neck complaints to the 1999 accident.
 

 On April 26, 2005, Dr. Jones referred the claimant back to Dr. Butler for an evaluation for possible cei-vical surgery. Dr. Butler examined the claimant a second time on May 23, 2005 at which he reported that he would make further treatment recommendations once he had an opportunity to review the second cervical MRI recommend by Dr. Jones on March 15, 2005 and performed on April 14, 2005.
 

 Dr. Butler examined the claimant a thii’d time on December 5, 2005, at which time he recommended a cervical myelo-gram which he stated “would resolve any issues with regards to the cervical spine that would be related to his previous job injury and warrant further treatment.”
 

 A claims adjuster employed by Cannon Cochran, a third party administrator for the NOPD, approved the procedure. Pursuant to directions from Dr. Butler, an | ,nattempt was made to perform the myleo-gram at the Slidell Medical Center, but it had to be aborted in the middle of the procedure when something went wrong with results described by the defendant as follows:
 

 And a couple days after that, I started having these terrible headaches where I couldn’t stand up without wobbling. So I went to the emergency l'oom, and they kept me for like three days.
 

 However, the claimant was unable to retake the myleogram, because approval for a second myleogram was declined by the claims adjuster.
 

 The claimant testified that he had never sustained any injury to his neck prior to the accident. He readily admitted on direct examination that prior to the accident he once ran into an air conditioner that required a single trip to the emergency room. There his neck was x-rayed and he was told he may have suffered a slight concussion, but he required no further medical attention, had no neck complaints, and missed only one day of work.
 

 Similarly he readily admitted to having two automobile accidents following the October 1999 accident, one in 2000 and the second in 2004. He testified that as a result of the 2000 accident, after wrapping up the police report, he went to the emergency room as a result of which he had some heat treatments for his upper back. His neck was not involved. He injured his lower back in the 2004 accident which did sciatic damage. Again, his neck was not involved.
 

 In its brief the NOPD also refers to a report of a visit with Dr. Jones that occurred on May 21, 2002, in which the claimant mentioned a fall that impacted his shoulder. However, the report does not attach much significance to it and Dr. Jones specifically mentioned that the fall did not appear to have affected the repair Into his shoulder. The NOPD’s post trial memorandum did not raise it as an issue. Instead the NOPD argued only that:
 

 The Employer’s claims handler relied, we contend reasonably, on Dr. Butler’s report dated January 26, 2005.
 

 Consistent with this statement found in the NOPD’s post trial memorandum is the testimony of Nicole Traína, a claims adjuster employed by Cannon Cochran, placing full reliance on the January 26, 2005 report of Dr. Butler. Cannon Cochran is a third party administrator for the NOPD.
 
 *121
 
 Ms. Traína started working for Cannon Cochran in April of 2005. Mr. Johnson’s file was not transferred to her until April of 2006. The fall mentioned in Dr. Jones’ report of May 21, 2002, was not a factor in her decision to deny the claimant’s claims. She testified that:
 

 Q. Okay. And is it fair to say that, other than the January 26, '05 report from Dr. Butler saying the neck’s not related, you don’t have any other medical documentation to support that decision, correct?
 

 A. Correct.
 

 We cannot say that the workers’ compensation judge was manifestly erroneous in giving no more weight to the claimant’s fall than the claims adjuster for the NOPD did.
 

 Ms. Traína testified that compensability for the claimant’s neck injury had already been denied by Deanna Messina, the prior adjuster on the file. Ms. Traína held to the same position concerning the claimant’s neck injury when she took over the file. But as Ms. Traina’s just quoted testimony shows, the only reason found in the record in support of the decision to deny the compensability of the neck injury is Dr. Butler’s report dated January 26, 2005, quoted previously wherein he states that: “I cannot with any reasonable certainty relate his neck complaints to the | ]2accident.” But Ms. Traína seems to have chosen to ignore the fact that subsequent to issuing his report on January 26, 2005, Dr. Butler appears to have modified his position by recommending a cervical myleogram. Ms. Traína admitted that the original myleogram which could not be completed had been approved. She testified that she believed that the myleogram was approved by mistake and that compensation for the complications arising therefrom were, accordingly, denied. The previous adjuster sent a letter saying that the myleogram was never approved, but Ms. Traína testified to the contrary. We cannot say that the worker’s compensation judge was manifestly erroneous if she found the internally conflicting and unfounded positions of the claims adjusters lacking reasonable good faith.
 

 Ms. Traína admitted that Dr. Butler issued a report in December of 2005 saying that he needed a myleogram in order to determine whether the claimant’s neck complaints were related to the accident, but the recommendation was denied. Dr. Butler continued to recommend the second myleogram on January 31, 2006 and on May 12, 2006. She admitted that she approved another MRI for Dr. Jones, but then declined his recommendation for a fourth surgery arising out of the MRI. Instead she instructed the case manager to send a letter to Dr. Butler asking his opinion about the fourth shoulder surgery proposed by Dr. Jones, but she did not ask .Dr. Butler to examine the claimant in connection with the request. She acknowledged that while Dr. Butler’s letter to the case manager dated July 26, 2006 expressed doubts as to whether the fourth surgery would benefit the patient, he nevertheless deferred to Dr. Jones as the claimant’s treating physician. Dr. Butler expressed the further reservation that he had treated the claimant for neck | i:icomplaints only, not his shoulder, i.e., expressing the opinion that he did not have sufficient information from which he could make an informed opinion.
 

 Ms. Traína also acknowledged a report from Dr. Butler in which he stated that:
 

 Dr. Jones will continue to treat [the claimant] with regards to his continued symptoms, and I will defer any recommendations for further treatment to Dr. Deryk Jones.
 

 Ms. Traína acknowledged that as early as June 10, 2003, Dr. Jones was recom
 
 *122
 
 mending a fourth surgery. In February of 2007, Dr. Jones indicated he still wanted to do the surgery, and it was not until that time that she applied for an Independent Medical Examiner. Never during all of this time from June of 2003 had Dr. Jones changed his position regarding the need for a fourth surgery. Her request for an Independent Medical Examiner was denied. In his last report dated March 30, 2007, Dr. Jones was still recommending a fourth surgery. Moreover, she never asked Dr. Butler or Dr. Nutik to reexamine the claimant. We cannot find manifest error with any conclusion by the trial court that the claims adjuster’s persistent reliance upon the opinion of Dr. Butler, in which Dr. Butler expressed himself to be unqualified in the matter relative to Dr. Jones, was not an act of good faith.
 

 The trial court concluded in its written reasons for judgment that the claimant “was a credible witness who was able to articulate his complaints and the emergence of his symptoms, which were corroborated by the medical records. Employer introduced no evidence to contradict Mr. Johnson’s testimony or to indicate that any other incident either before or after the subject accident had caused or contributed to Mr. Johnson’s neck problems.”
 

 |14In the context of the testimony discussed in detail above along with the exhibits offered in connection therewith and the medical records accepted into evidence, we find the judgment and reasons for judgment of the workers’ compensation judge to be supported by the record. The trial court was reasonable in concluding that the plaintiffs testimony in the absence of any contradictory medical evidence, was sufficient to prove a causal relationship of his symptoms to his uncontested employment related injury. The medical evidence showed that such a connection was possible and that, along with the claimant’s credible testimony about how his symptoms evolved is sufficient, especially in view of the failure of the NOPD to make a good faith effort to disprove the claims. The NOPD does not challenge the credibility of the claimant. As this Court stated in
 
 Dales v. Ceco Concrete Const.,
 
 02-2740 (La.App. 4 Cir. 6/4/03), 849 So.2d 790:
 

 In determining whether the worker has discharged the burden of proof, the trier of fact should accept as true a witness’s uncontradicted testimony, even though the witness is a party, absent circumstances casting suspicion on the reliability of his testimony. A worker’s testimony alone may be sufficient to discharge the burden of proof provided that two essential elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the incident.
 

 Id.,
 
 02-2740, p. 4, 849 So.2d at 790.
 

 The claimant expressed a desire to continue seeing Dr. Butler for his neck and to have the fourth shoulder surgery recommended by Dr. Jones. The workers’ compensation administrator has not referred him to another doctor for an opinion on his shoulder.
 

 l1sWhen asked on cross examination whether Dr. Jones would be able to give him any kind of assurance that a fourth surgery would do away with the pain he was having, he responded:
 

 The last time we met, he said, due to the extent of time passing from the time he requested it, he wasn’t sure if he was going to be able to get rid of all of the pain that I have.
 

 The failure of the NOPD through its claims adjusters to properly consider the claimant’s claim is borne out by the fact
 
 *123
 
 that while Dr. Jones consistently recommended a fourth surgery from June of 2008 onwards, the claims adjuster did not decide to deny the request until 2007. Part of the reason given was that the claims adjuster was not sure he would benefit from such a procedure; but that was based on an opinion from a doctor who disclaimed any authority in the matter— hardly the clear, unambiguous medical report described by the NOPD. Additionally, it appears that any shortcomings to be anticipated in the success of such a fourth surgery could be attributable to the unreasonable delay for approval. In other words, had the NOPD reacted to the surgery request on a timely basis, its prospects for success would have been greatly increased. As the first three such surgeries were approved as causally related to the accident, it is difficult to see how in good faith the fourth such surgery recommended by the same doctor for the same complaints would not be also.
 

 Then there is the fact that the claims adjuster who approved the first myleo-gram, later sent a letter after the fact saying that it had not been approved. This led to the denial of benefits in connection with the consequential side effects sustained by the claimant when the first, approved myleogram went awry. The NOPD does not dispute the fact that the claimant is entitled to such benefits where j ifithey arise in consequence of qualified medical treatment. This is especially true where there are no allegations that the side effects experienced by the claimant occurred as the result of the independent intervening negligence of a third party.
 

 This action on the part of the claims adjuster also led to the denial of the recommendation for a second myleogram which Dr. Jones said was necessary if he were to determine definitively the relationship between the claimant’s symptoms and his work related accident. Based on all of the foregoing, we cannot say that the worker’s compensation judge’s findings concerning penalties were manifestly erroneous or clearly wrong.
 

 On July 2, 2007, subsequent to the June 1, 2007, trial discussed above, the trial court ordered that the claimant be given the second myleogram he had sought for so long. This Order is not to be found in the record, but its existence is acknowledged by both parties. Pursuant to that order, the NOPD submitted the myleo-gram report dated August 3, 2007 along with the medical report of August 8, 2007. Dr. Butler reported that “... it is likely that his residual neck and arm symptoms are caused by the changes at C6-7 and it is possible that the changes at C6-7 could have been caused by the accident in question or aggravated by the accident in question and initially his symptoms may have been obscured by the pathology in his right shoulder treated by Dr. Deryk Jones. When this report which shows that the claimant’s cervical problems are consistent with the accident he sustained in October of 1999 and, in fact, could have been caused by that accident, is coupled with the claimant’s credible testimony, we cannot say that the judge below’s findings concerning causation were manifestly erroneous or clearly wrong.
 

 117The NOPD also assigns as error the refusal of the trial court to grant a new trial for the purpose of receiving more evidence from Dr. Butler concerning causation. However, such evidence could have been obtained with reasonable diligence and made available at the time of the original trial. Therefore, we find no error in the decision of the trial court to deny the NOPD’s request for a new trial. La. C.C.P. art. 1972(2).
 

 
 *124
 
 For the foregoing reasons, the judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . La. R.S. 23:1201 F. La. R.S. 23:1201 F is penal in nature and, therefore, must be strictly construed.
 
 Moore v. City of New Orleans,
 
 02-1036, p. 12 (La.App. 4 Cir. 1/29/03), 839 So.2d 380, 388.
 

 [2]
 

 . Accord
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840, (La.7/1/97), 696 So.2d 551, 556. The Louisiana Supreme Court in
 
 Banks
 
 went on to note that: "Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong."
 
 Id.