839 So.2d 1208 (2003)
Lillie BALL, Plaintiff-Appellee
v.
WENDY'S INTERNATIONAL, INC., Defendant-Appellant.
Lillie Ball, Plaintiff-Appellee
v.
McDonald's Hamburgers, Defendant-Appellant.
No. 36,922-WCA, 36,923-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 5, 2003.
*1211 John J. Rabalais, Covington, Rabalais, Unland & Lorio, Counsel for Appellant Wendy's.
Eskridge E. Smith, Jr., Eskridge E. Smith, Jr. Law Corp., Bossier City, Counsel for Appellant McDonald's.
David P. Daye, Daye, Bowie & Beresko, Shreveport, Counsel for Appellee.
Before GASKINS, CARAWAY and MOORE, JJ.
MOORE, J.
Both employers, McDonald's Hamburgers ("McDonald's") and Wendy's International ("Wendy's"), appeal a judgment finding that the claimant, Lillie Ball, sustained occupational diseases and a work-related accident. The judgment awarded her indemnity benefits (temporary total disability and supplemental earnings benefits), casting McDonald's and Wendy's as joint obligors each liable for 50% of all such benefits accruing after September 30, 2000. It also ordered Wendy's to authorize medical treatment for a ganglion cyst.
We affirm the finding that Ms. Ball sustained occupational diseases while employed at McDonald's and was disabled as a result. We reverse the finding that she was disabled by the accident at Wendy's. We therefore amend the judgment to make McDonald's solely liable for Ms. Ball's indemnity benefits and to delete the award of medical expenses against Wendy's.

Factual background
Ms. Ball began working at a McDonald's in 1973. She testified that for about the first 10 years she was a grill cook, pressing and flipping each frozen patty individually on a griddle. After about 10 years, she was promoted to crew trainer, and then to manager; these jobs required her to work in any and all "pit" positions, but none of them regularly. By the early 1990s, McDonald's converted to clam-shell shaped grills that do not require the cook to press burgers manually. In early 1997, Larry and Susan Chrisman bought the franchise that included the Airline Drive SPOD (special point of distribution, a reduced-size McDonald's) in a Chevron gas station where Ms. Ball was working. By 2000, Ms. Ball was earning $2,200 a month.
Although she was not precise about the time frame, Ms. Ball testified that between 1997 and 1999 she began to suffer from pain in both wrists. She never missed any work because of this. In May 2000, however, she decided to quit McDonald's because the Chrismans would not give her leave to attend her grandmother's funeral. Then, on the night of May 23, the pain got so bad in her right wrist that she went to the emergency room at Willis-Knighton hospital the next day. She testified that her wrist felt like she had "sprung" it, but she told the E/R doctor that she struck it on a rack at work. Hospital records also indicate that she sought treatment for her left wrist, but she was certain it was the right. Doctors gave her a splint and pain medication, and advised her to see an orthopedist. She missed no work for this emergency room visit, which she charged *1212 to her McDonald's group health insurance funded entirely by McDonald's.
Ms. Ball's last day at McDonald's was June 2, 2000. On June 26, she began a new job as assistant manager-in-training at the Wendy's on Bert Kouns, earning $1,019 every two weeks. The four-week training period included two weeks in which she had to work daily 40-minute shifts at the grill. Wendy's still uses a flat grill; the cook must manually press and flip each patty. Ms. Ball told her district manager that she had pre-existing problems with her hands and wrists; according to the district manager, she said it was carpal tunnel syndrome ("CTS"). She testified that the burger flipping and other job activities made her wrists hurt, and on occasion she wore the splint to work. However, she always performed her job duties.
Ms. Ball saw Dr. Atchison, an orthopedic surgeon, on August 1, 2000 (she testified this was the earliest she could schedule an appointment). She complained of pain in both wrists and a cyst on her right wrist. The doctor ordered tests that showed severe CTS in both wrists, but worse on the right, so severe that some denervation, or loss of nerve function, was already present. Dr. Atchison advised prompt surgery, which Ms. Ball underwent on August 24 to release the right carpal tunnel and remove the cyst. Ms. Ball charged this operation and Dr. Atchison's bills to Wendy's group insurance, funded 70% by Wendy's. He released her to return to work on September 17.
On her second day back at Wendy's, September 19, 2000, Ms. Ball was trying to wring a mop in a bucket when the wringer handle suddenly released and struck her in the right wrist, directly on the site where the ganglion had been removed. She testified that she fell to the floor doubled in pain, and that the impact raised a welt on the incision site. The next day, however, Dr. Atchison examined her and did not notice any bump or welt other than normal post-operative swelling. Ms. Ball testified that she worked two more days at Wendy's but then was in too much pain to perform all her job duties. She told the district manager that she needed more time to recover from her operation, although she did mention striking her wrist on the mop handle. She has not worked since. At trial in March 2002, the district manager testified that he still considered Ms. Ball an employee on leave.
In October 2000, Ms. Ball was still complaining of pain in both wrists; based on her history, Dr. Atchison ascribed this to housework. Nevertheless, he sought a second opinion from one of his partners, Dr. Marion Milstead, whom Ms. Ball now considers to be her treating physician. On November 13, Dr. Milstead noted that a keloid scar had formed over the ganglion incision. He also recommended that she have surgery on her left wrist to release the carpal tunnel, as well as to treat de Quervain's disease, an inflammation of the tendons around the thumb. On December 7, Ms. Ball underwent surgery on her left wrist with Dr. Jones, another of Dr. Atchison's partners. Dr. Jones performed this endoscopically to avoid making an incision that might result in another keloid scar.
In early 2001, Dr. Milstead ordered an EMG which found only mild CTS in Ms. Ball's right wrist, but no nerve damage. He concluded that the surgery had yielded considerable improvement. He later reported that she reached maximum medical improvement of her right wrist by July 16, 2001, and of her left wrist by September 6, 2001. He restricted her from any work *1213 involving repetitive flexion or extension of her wrist or fingers, and from lifting any weight over 15 lbs. on an intermittent basis. Ms. Ball testified that she now has "trigger finger," or a stiffening and tightness in the joints of her left middle finger. She added that she cannot do the job she was hired for at Wendy's or her last job at McDonald's, but if these jobs were modified, she felt she could handle them.
In March 2001, Ms. Ball filed a disputed claim against Wendy's, alleging the mop-handle incident as a work-related accident and claiming indemnity and medical benefits, penalties and attorney fees. In May 2001, she filed a disputed claim against McDonald's, urging that because of repetitive motion she developed occupational diseases of the hands. She also claimed indemnity and medical benefits, penalties and attorney fees. The cases were consolidated in the OWC.
McDonald's filed a third party demand against Wendy's, urging that Ms. Ball's work at Wendy's was her "last injurious exposure" to the conditions that caused her CTS. Citing Gales v. Gold Bond Building Products, 493 So.2d 611 (La.1986), it argued that as the last successive employer to expose her to an occupational disease, Wendy's should be fully responsible for all compensation due. Wendy's urged, however, that Gales did not apply, as it was based on the concept of solidary liability that was repealed by the 1996 amendments to La. C.C. arts. 2323 and 2324.
Trial was held in March 2002. Without assigning reasons, the WCJ rendered judgment finding that Ms. Ball sustained occupational diseases while employed at McDonald's, but these were not related to her work at Wendy's. It therefore cast McDonald's for the bulk of Ms. Ball's medical expenses, subject to certain credits and reductions,[1] and for temporary total disability benefits of $338.43 a week from August 24 through September 17, 2000. It further found that Ms. Ball sustained an accident at Wendy's on September 19, 2000, and ordered Wendy's to authorize and pay for medical treatment recommended by Dr. Milstead for the cyst.
The WCJ awarded Ms. Ball temporary total disability benefits of $338.43 a week from September 30, 2000 through September 6, 2001, and supplemental earnings benefits from September 7, 2001 onward, in accord with La. R.S. 23:1221(3). The WCJ further ruled that indemnity benefits accruing after September 30, 2000, were joint obligations of which McDonald's and Wendy's each owed 50%. The WCJ denied McDonald's third party demand against Wendy's and rejected Ms. Ball's claims for penalties and attorney fees.
McDonald's appeals, listing nine assignments of error but presenting three arguments. Wendy's also appeals, advancing five assignments of error in three arguments. Ms. Ball has filed a brief urging that the judgment should be affirmed.[2]

Discussion: Occupational disease at McDonald's
By its first argument, McDonald's urges that Ms. Ball did not prove by a preponderance of the evidence that her CTS and other occupational diseases resulted from conditions peculiar to her employment *1214 at McDonald's with the Chrismans. It argues that according to Dr. Milstead, manually flipping and pressing burgers is the only work in the fast-food industry that could cause CTS, but that Ms. Ball had quit working as a grill cook long before the Chrismans bought the franchise in 1997. It also challenges Dr. Milstead's opinion that these activities cause CTS, as based on casual observation rather than scientific study.[3]
A claimant asserting an occupational disease must prove by a preponderance of the evidence that there is a disability which is related to an employment-related disease, that the disease was contracted during the course of employment and that the disease is a result of the work performed. Fite v. Louisiana Title Co., 36,393 (La.App. 2 Cir. 9/18/02), 828 So.2d 165, and citations therein. An occupational disease means "only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." La. R.S. 23:1031.1 B. This means that the disease must originate from conditions in the employment that result in a hazard that distinguishes the employment in character from the general run of occupations. Fite v. Louisiana Title, supra. The claimant will fail if there is only a possibility that the employment caused the disease, or if other causes not related to the employment are just as likely to have caused it. Hymes v. Monroe Mack Sales, 28,768 (La.App. 2 Cir. 10/30/96), 682 So.2d 871. Expert testimony is required to support a finding of an occupational disease. Fite v. Louisiana Title, supra. The WCJ's factual findings are subject to manifest error review. Hoy v. Gilbert, 98-1565 (La.3/2/99), 754 So.2d 207.
Ms. Ball testified that after working some 10 years exclusively as a grill cook, she was promoted to crew trainer and then to manager. She was clear, however, that even managers may be required to perform any and all crew-type activities on a daily basis. She admitted that she had symptoms for at least a year before she went to the emergency room in May 2000. Dr. Milstead corroborated, based on personal observation, that all the activities of fast-food workers (flipping burgers, opening buns, squirting ketchup) may be repetitive, and that he had many CTS cases from their ranks. Based on Ms. Ball's work history, Dr. Milstead concluded that her CTS came on gradually from working at McDonald's, and the problem continued until aggravated by a minor trauma, such as striking her hand on a rack before the emergency room visit. In light of Dr. Milstead's testimony, the case is not devoid of expert medical evidence, as occurred in Fite and Hymes, supra. His opinion is sufficient to prove causation by a reasonable preponderance of the evidence. Admittedly, Dr. Atchison declined to say that Ms. Ball's work caused her CTS and the related conditions, but he apparently was not as informed about her work history as Dr. Milstead.
For these reasons, the WCJ was entitled to find that Ms. Ball proved by a preponderance *1215 of the evidence that she contracted CTS during the course of her employment at McDonald's and that the disease was the result of the work performed. McDonald's first argument lacks merit.

Occupational disease at Wendy's
By its second and third arguments, McDonald's urges the WCJ erred in finding that Ms. Ball's occupational diseases were not related to her work at Wendy's. It argues that in 23 years at McDonald's, Ms. Ball never missed a day of work because of CTS symptoms, but when she began at Wendy's she was required to perform tasks that made her condition symptomatic and disabling. McDonald's contends that Ms. Ball's short term of work at Wendy's qualified as her "last injurious exposure" to the occupational disease; for this reason Wendy's is solely responsible for her compensation under Gales v. Gold Bond Building Products, supra. McDonald's further argues that the "last injurious exposure" is still valid despite the 1996 amendments to La. C.C. arts. 2323 and 2324 that abrogated solidary liability.
By its first argument, Wendy's responds that the evidence clearly supports the WCJ's finding. It contends that because Ms. Ball worked at Wendy's less than 12 months, her occupational disease is not presumed to be related to that employment. La. R.S. 23:1031.1 D. It argues that Ms. Ball did not rebut the presumption: according to both Dr. Milstead and Dr. Atchison, repetitive motion diseases such as CTS and de Quervain's disease take a long time to develop, and could not result from three months of work at Wendy's. It also cites Ms. Ball's testimony that symptoms had arisen at least a year before May 2000. Wendy's concludes that without proof of causation, there is no application of the "last injurious exposure" rule and no basis for assigning any liability, joint or solidary, for Ms. Ball's compensation benefits.
The presumption of causation applicable to occupational disease claims is stated in R.S. 23:1031.1 D, as amended by 2001 La. Acts No. 1189, effective June 29, 2001:
Any occupational disease contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed not to have been contracted in the course of and arising out of such employment, provided, however, that any such occupational disease contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by a preponderance of the evidence.[4]
This subsection creates a statutory presumption (or "predicate fact") regarding the causation or contraction of an occupational disease. Davies v. Johnson Controls Inc., 36,498 (La.App. 2 Cir. 10/23/02), 830 So.2d 462. The claimant may show by medical and other relevant evidence that she contracted the disease as a result of employment that lasted under 12 months, or that the disease did not predate that employment. However, this proof must be by a preponderance of the evidence. Id.
Ms. Ball began work at Wendy's on June 26, 2000; on August 24 she began a *1216 medical leave for surgery on her right wrist with Dr. Atchison; she returned to Wendy's on September 18 and worked three days before taking another medical leave. Her actual work history at Wendy's was therefore approximately two months, activating the presumption that her occupational diseases were not caused by that employment. R.S. 23:1031.1 D.
As noted, Dr. Milstead described her condition as arising from 23 years of work at McDonald's, gradually worsening over time; he regarded her move to Wendy's as "coincidental," and her symptoms a continuation of the pre-existing disease. Even Ms. Ball testified, on several occasions, that working at Wendy's did not make her wrist pain any worse. "It was just still hurting." R. p. 376. This evidence supports the finding that Ms. Ball's CTS and other repetitive motion diseases existed before and did not result from her employment at Wendy's. The WCJ was not plainly wrong to find that neither Ms. Ball nor McDonald's rebutted the presumption of R.S. 23:1031.1 D that her occupational diseases were not related to her work at Wendy's.
In Gales v. Gold Bond, supra, the court interpreted R.S. 23:1031.1 as "open textured and ambiguous" on the subject of multiple employer liability because it "alternately links the employer's obligation with the employee's contraction of or exposure to disease during employment." Citing the law of solidarity, the court held that when successive employers "contribute to an employee's occupational disease," they are solidarily liable to the claimant. Noting special policy considerations, the court further held that the last obligor during whose employment the employee was injuriously exposed to a cause of disease is liable for the whole compensation obligation. McDonald's vigorously argues that this principle mandates a finding that Wendy's is solely responsible for Ms. Ball's compensation.
The court's analysis in Gales, however, presupposes that the final employer caused or contributed to the occupational disease. The claimant in Gales, an asbestosis sufferer, had worked two years for his final employer and the opinion states that he was exposed to airborne asbestos during that time. In short, the record showed that the final employer contributed to the disease. In Davies v. Johnson Controls, supra, this court carefully considered a claim based on CTS allegedly contracted on a job at which the claimant had worked for less than four months. The evidence showed that the claimant's condition predated his work at Johnson Controls. This court affirmed a judgment of involuntary dismissal against the final employer. Although we did not specifically address the last injurious exposure rule, we concluded that a finding of causation was requisite to any compensation liability. After close review of Gales, we reiterate the rationale of Davies and find that the instant case does not implicate the last injurious exposure rule.
Wendy's urges that without proof of causation, there is no basis for assigning it any liability, joint or solidary, for Ms. Ball's compensation. We agree, on the basis of Davies v. Johnson Controls, supra. The judgment, to the extent that it casts Wendy's as jointly liable for 50% of Ms. Ball's indemnity benefits after September 30, 2000, is reversed. The judgment is amended to cast McDonald's for all indemnity benefits.

Work-related accident at Wendy's
By its second and third arguments, Wendy's urges that Ms. Ball failed *1217 to prove that her cyst was caused by her employment at Wendy's or that the cyst was responsible for any of her current disability. It cites Ms. Ball's undisputed testimony that the cyst first appeared during her employment with McDonald's; that the day after the mop bucket incident, Dr. Atchison did not notice that the cyst had reappeared; that neither he nor Dr. Milstead ascribed its later recurrence to the mop bucket incident; and that both doctors said cysts could simply recur. Wendy's further argues that no medical evidence shows that the cyst, as opposed to the residual effect of her CTS and de Quervain's disease, caused her current disability. Wendy's concludes that this evidence provides no basis to hold it liable for her indemnity benefits or any medical treatment related to the cyst.
An injured employee is entitled to receive benefits for an injury that arises out of and in the course of her employment. La. R.S. 23:1031. The claimant bears the initial burden of establishing a causal connection between the disability and the work-related accident by a preponderance of the evidence. The claimant is not required to establish the exact cause of the disability, but must show by a preponderance of proof that the accident had a causal connection with the disability. Quinones v. U.S. F. & G., 93-1648 (La.1/14/94), 630 So.2d 1303; Pearce v. Medallion Const., 36,351 (La.App. 2 Cir. 11/6/02), 830 So.2d 576. The claimant's testimony alone may be sufficient to discharge this burden, but it is inadequate when (1) other evidence discredits or casts serious doubt upon the worker's version of the incident, or (2) the claimant's testimony is not corroborated by the circumstances following the alleged incident. Pearce v. Medallion Const., supra. Compensation is due for only such injuries as are proven by competent evidence, or for which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the claimant herself. La. R.S. 23:1317 A.
The record supports the WCJ's finding that Ms. Ball sustained a work-related accident on September 19, 2000. Aside from her own testimony, however, the evidence does not preponderate to show that the accident caused the cyst to reappear. Notably, the day after the mop bucket incident, Dr. Atchison observed some swelling over the ganglion site, but no worse than two weeks earlier; he considered it only normal post-op swelling. Several weeks later, Dr. Milstead found a keloid scar over the cyst incision, but he did not notice a recurrent ganglion cyst until April 10, 2001, almost seven months after the mop bucket incident. He explained that if the cyst had reappeared within two weeks of the trauma, he could ascribe it to that trauma, but he refused to say what caused this one to recur. Likewise, Dr. Atchison stated that the recurrent cyst "probably had nothing to do with the actual trauma." Atchison's Dep., 44. In short, objective medical findings cast doubt on Ms. Ball's impression that the mop bucket incident caused the cyst to recur.
Moreover, Dr. Milstead reported that Ms. Ball's current work restrictions result from de Quervain's disease, related to her work at McDonald's, and not from the cyst. We are constrained to find that Ms. Ball failed to prove, by a preponderance of the evidence, that her work-related accident at Wendy's caused the ganglion cyst to recur or resulted in any of her current disability. For these reasons, the portion of the judgment ordering Wendy's to pay *1218 part of Ms. Ball's indemnity benefits and to authorize further treatment of the cyst will be reversed.
Finally, we note that the judgment recites that Ms. Ball "is awarded medical treatment recommended by Dr. Marion Milstead for the volar ganglion cyst to be authorized and paid for by the defendant, Wendy's International, Inc." However, in his final progress note, September 6, 2001, Dr. Milstead stated that she was at maximum medical improvement, and in his deposition, February 21, 2002, he did not recommend any further medical treatment. Since there is not one scintilla of evidence to support this portion of the award, it will be reversed. La. R.S. 23:1203 A; Chitman v. Davison Trucking, 28,073 (La.App. 2 Cir. 2/28/96), 669 So.2d 671.

Conclusion
For the reasons expressed, we affirm the judgment insofar as it finds that Ms. Ball sustained occupational diseases at McDonald's and was disabled as a result. We reverse the judgment insofar as it casts Wendy's for any portion of Ms. Ball's indemnity benefits, as well as the provision for Wendy's to provide medical treatment for the ganglion cyst. The judgment is amended to cast McDonald's for all indemnity benefits. Costs are assessed to the appellant, McDonald's Corporation.
AFFIRMED IN PART, REVERSED IN PART, AND AMENDED.
NOTES
[1] The credits and reductions are not contested on appeal.
[2] Ms. Ball actually answered the appeal, contesting the denial of mileage, penalties and attorney fees. This court rejected the answer to appeal as untimely, but has considered her arguments in support of the WCJ's judgment.
[3] McDonald's also argues that Ms. Ball's CTS did not manifest itself until her subsequent work at Wendy's, so Wendy's either caused the occupational disease or created her last injurious exposure to it, making Wendy's solely liable under Gales v. Gold Bond Building Products, supra. We will discuss this contention as part of McDonald's second and third arguments.
[4] The amendment, changing the burden of proof from an "overwhelming preponderance" to a mere preponderance of the evidence, is retroactive. Davies v. Johnson Controls Inc., 36,498 (La.App. 2 Cir. 10/23/02), 830 So.2d 462.